EAGAN et al. v. COMMISSIONER OF IN-
TERNAL REVENUE.
No. 5836.

Circuit Court of Appeals, Fifth Circuit.

Oct. 14, 1930.

Robert C. Alston and William H. Sibley, both of Atlanta, Ga., for petitioners.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and F. Edward Mitchell, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Prew Savoy, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before BRYAN and FOSTER, Circuit Judges, and SIBLEY, District Judge.

SIBLEY, District Judge.

John J. Eagan died a resident of Georgia March 30, 1924. A bequest in a codicil to his will was claimed by his executors to be exclusively for charitable purposes and that its value was deductible in fixing the estate tax. The claim was disallowed by the Board of Tax Appeals. 17 B. T. A. 694. The controlling statute is section 403 of the Revenue Act of 1921, 42 Stat. 279, the material portion of which is:

"For the purpose of the tax the value of the net estate shall be determined—(a) In the case of a resident, by deducting from the value of the gross estate * * * (3) The amount of all bequests * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual; or to a trustee or trustees exclusively for such religious, charitable, scientific, literary, or educational purposes."

In determining whether the bequest in controversy is within this provision, it is necessary to inquire whether it is to, or for the use of, a corporation, in which case the organization and operation of the corporation become important; or is to trustees, in which case whether the purposes of the trust are exclusively charitable becomes the determining question. The codicil defines the legatees in these provisions:

"I hereby give, bequeath and devise ten hundred and eighty-five (1085) shares of the common stock of the American Cast Iron Pipe Company, being all my holding of the said common stock of said company, to the members of the Board of Management and the members of the Board of Operatives of said American Cast Iron Pipe Company jointly, and their successors in office in said boards, in trust for the following purposes, etc. * * * Any member of either of said boards, who shall cease to be a member of either board for any cause whatsoever shall thereupon cease to be a trustee under this codicil of my will, his or her successor upon either of said boards becoming, by virtue of his or her office, a trustee under this codicil immediately upon his or her acceptance of said trust. * * * It is my will and desire and I direct that in determining all questions as to voting said stock and as to carrying out the provisions of the trust created by this codicil the members of the Board of Management, as trustees, shall vote as a unit, and the members of the Board of Operatives, as trustees, shall vote as a unit, the vote of

each group to be determined by the majority vote of the members of the respective boards, and that in the event of failure of the respective groups of trustees to agree upon any question, said question in dispute shall be referred to the Board of Trustees, whose decision shall be final."

The board of trustees last mentioned has been held to mean the board of directors of the company. The board of managers, formerly called the executive committee, was, under the by-laws, appointed by the directors and was composed of four or five of the directors who had active charge of departments, and this board managed the company's business between meetings of the directors. The board of operatives, also established under the by-laws, consisted of an operative elected annually by his fellow operatives in each of the ten or twelve departments of the business. Its function was to present grievances and make suggestions to the board of managers, to obtain information for the operatives, and generally to promote confidence and co-operation between the employer and employees and the welfare of both. The board of operatives also elected three of their number to be directors, thus giving the operatives direct knowledge of the company's business and a part in its control. The stock bequeathed is the entire common stock of the company. The preferred stock, none of which was owned by Mr. Eagan, has no voting power. It thus appears that the ultimate control of the corporation is put in the trustees, and they in turn are chosen by the machinery of the corporation, and their differences are to be reconciled by its Board of Directors. Nevertheless the bequest is not to the corporation or for its use, but specifically to the members of the two named boards and their successors as individuals. These persons are not identical with the board of directors who control the corporation. Not all of the directors are on the board of managers and so made trustees, and not all the board of operatives, who are all made trustees, are on the board of directors. The duties of these trustees who are also directors are entirely distinct in the two capacities. The director's duty in running the business of the corporation remains the same when he becomes also a trustee. His duties as trustee relate to managing the stock and arise from and are controlled by the will creating the trust. The reconcilement of differences between the two groups of trustees by the board of directors, if that is what the testator meant by·"Board of Trustees," is a mere umpirage. The ultimate control of the corporation through the stock ownership no more makes the trustees identical with the corporation than it did Mr. Eagan when he was the sole owner of the stock. The bequest is of the stock, not of the plant and business, of which the preferred stockholders are part owners. It is to trustees and not to a corporation or for its use. The organization and operation of the corporation are therefore not material, but the last clause of the quoted statute which relates to bequests to trustees alone applies.

 Are the purposes of the trust exclusively charitable? It is urged that they are clearly so under the statutes of Georgia defining charities, Park's Code, § 4605, and have been held to be such by decree in a bill for direction filed by the executors of Eagan's will against the trustees. The Georgia statute and the decree are material to establish the effectiveness of the trust which depends upon state law. The Revenue Act did not intend to except trusts which could not lawfully take effect, but only those which can and do become operative. But the decree involved no question under the Revenue Laws of the United States, and the United States were not parties to it. Touching the present question, therefore, it is of no force as an adjudication or as authority. As to the Georgia statute, while Congress may so legislate as to refer to the peculiar laws of the several states, or even adopt them, as in the case of the Conformity Statute or of homesteads in bankruptcy, ordinarily· descriptive terms used in the acts are not to be interpreted by local state standards, but are to have a general and uniform interpretation throughout the country. Weiss v. Wiener, 279 U. S. 333, 49 S. Ct. 337, 73 L. Ed. 720; Calhoun Co. v. Ajax Co., 182 U. S. 499, 505, 21 S. Ct. 885, 45 L. Ed. 1200. The Georgia statutes are helpful in determining what is meant by the word "charitable" only in so far as they contribute to the general understanding throughout the United States. In this connection charitable means directed to or proceeding from charity. Charity may have a colloquial meaning of unselfish aid to the needy, including gifts to particular individuals, or a much broader legal significance coming from the Codes of Justinian through the English law into the general American law, and embracing probably all the governmental, scientific, religious, and educational purposes mentioned in this statute, but applying not to gifts to individuals but only to those to the public or substantial representatives of the public. There is no need to decide in which meaning it was here used for we think the purposes of the present trust

are charitable under either. Its purposes are to be arrived at from the terms of the will creating it. What had been done by Mr. Eagan before his death as part of the circumstances of the making of the will, and what has been done since by the trustees as a practical construction of the will by them, might have some relevancy if the construction were doubtful; but if the will is clear in its meaning previous happenings are irrelevant, and conduct of the trust since, if not in accordance with it, is merely perversion or mismanagement of the trust to be corrected by proper authority.

█ The purposes of the trust are stated in the will thus:

"First, to receive all dividends paid upon said stock and use so much of the dividends thus received as said trustees in their discretion may deem advisable in supplementing the salaries and wages of the employees of the said American Cast Iron Pipe Company in amounts sufficient in the judgment of the trustees to insure to each of said employees an income equivalent to a "living wage," said Trustees to be the sole judges of what constitutes a "living wage" and of the amount, if any, to be paid to each of said employees of said company.

"Second, to use such sums from the dividends received upon said stock as said trustees in their discretion may deem advisable in paying an income to any employee, or to the wife and minor children of any employee of said American Cast Iron Pipe Company at such times as the plant of said company may shut down for any cause, or at such times as said employee, through no fault of his or her own but through accident, sickness or other unavoidable cause, shall be unable to work, and said trustees are hereby made the sole judges of the amounts, if any, which shall be paid by said trustees to any employee or the members of any employee's family, under this paragraph."

These two purposes direct the use of part of the dividends to supplement wages when less than a living wage is paid, and part for accumulation for use in periods of unemployment.

"The provisions of the two paragraphs immediately preceding shall apply to the wife or child or the wife and children or the children of said employee of said company, if there be wife or child or children or both, provision having been made for them in the event of the death of said employee leaving such, under the rules for the management of said company of its pension fund."

█ The meaning here is not entirely clear, but we take it that it directs or permits the use of dividends also to pension the family of deceased employees according to rules established by the company in the operation of its pension fund. This has in fact been done by the trustees. Each of these three purposes is clearly charitable in the colloquial sense. An income less than a living wage certainly implies the existence of need. Provision for the widow and orphans of a working man is charity. Assistance to the unemployed is now rendered by many governments as a public duty. That the beneficiaries are limited to the employees for the time being of a single company does not so restrict the charity as to defeat it in the legal sense. Mr. Eagan's estate having parted with all his stock, there was no selfish interest to be served. The gift not being to particular individuals, but to a shifting class, is not a mere private bounty. The employees of the company at the time of testator's death numbered 1,470, and they and their dependents numbered about 6,000 persons, and so constituted a considerable portion of the public. A trust for their relief in the ways specified meets the general tests for a public charity in the legal sense. 11 C. J. 299, 306, 338, 339. In Sibley v. Commissioner of Internal Revenue, 16 B. T. A. 915, similar language of the same Revenue Act of 1921, in sections 231 (6) and 214 (a) (11), relating to exemptions from income tax, was applied to contributions to a corporation organized for the purpose of aid to employees of a large department store in case of death or disability. The purpose there was held to be exclusively charitable and the holding is amply sustained by the reasoning and authorities cited.

The next declared purpose of the trust is:

"Third, to vote said certificates of stock in said American Cast Iron Pipe Company at all meetings of the stockholders of said company."

This is but a necessary consequence of the stock ownership and incident to any trust of corporate stock. It does not prevent the trust being exclusively charitable. But the will continues:

"By this codicil to my will and testament it is my purpose, will and desire to create a trust estate both for the benefit of persons actually in the employ of said American Cast Iron Pipe Company and for such persons as may require the products of said company. The trustees appointed by this codicil in accepting the trust will be trustees both for said employees and said persons requiring the

products of said company. It is my will and desire that said trustees in the control of said company through the control of the common stock, shall be guided by the sole purpose of so managing said company as to enable the said American Cast Iron Pipe Company to deliver the company's product to persons requiring it at actual cost, which shall be considered the lowest possible price consistent with the maintenance and extension of the company's plant or plans and business and the payment of reasonable salaries and wages to the employees of said company, my object being to insure service both to the purchasing public and to labor on the basis of the Golden Rule given by our Lord and Savior Jesus Christ."

This purpose, it is urged, is not charitable and thereby the trust is made not exclusively such. When it is remembered that the chief use of cast-iron pipe, which with its fittings constitutes the sole product of this company, is for water and gas mains and sanitary plumbing, intimately related to the health and welfare of all the people and often provided or regulated by government, there may be some ground to urge that the cheapening of such material to the public is a public charity. We think, however, that notwithstanding the strong language of the will, this purpose must be considered as only suggestive to the trustees, and is incapable of effective enforcement as a part of the trust. The trustees as such sell no pipe and fix the price on none. They only elect the directors. They are not required or authorized to pay any of the trust funds in their hands to any customers. No would-be customer could sue them to force a sale to him at cost. The language defining actual cost cannot be taken literally for it excludes the guaranteed dividend on the preferred stock, which must be paid, and would afford no return on the common stock as dividends, the disposition of which is the main activity of the trustees. Only an ideal of management is suggested. It is not a selfish purpose, and if it helps the corporate business in any way the benefit goes to the charities to which the dividends are to be applied. It does not detract from the exclusively charitable nature of the purposes which are effectively declared. In the case of Sibley v. Commissioner, supra, and In re Turnure v. Commissioner of Internal Revenue, 9 B. T. A. 871, the social and fraternal purposes of the corporations involved were held not to prevent their being exclusively charitable within the meaning of the revenue laws.

We conclude that the trust created by Eagan's will is exclusively charitable and its value should be deducted in arriving at the net value of his estate for taxation.

The petition is granted, and the cause remanded for further proceedings not inconsistent with this opinion.